**DOZART v. F. STRAUSS & SONS et al.**

No. 5565.

Court of Appeal of Louisiana.
Second Circuit.

March 8, 1938.

Rehearing Denied April 1, 1938.

Hawthorn, Stafford & Pitts, of Alexandria, for appellant.

W. C. Roberts and John R. Hunter & Son, all of Alexandria, for appellees.

DREW, Judge.

This suit arose out of an automobile collision which occurred on the Alexandria-Monroe highway approximately 6 miles north of Pineville, La., at a point where there is an "S" curve in the highway. Plaintiff, traveling north in a half-ton Ford pick-up truck, had negotiated the curve and was in the act of going out of it at the north end, when his truck collided with a five-ton Diamond-T truck, owned by defendant F. Strauss & Sons, traveling in a southerly direction and being in the act of entering the north end of the curve.

The accident occurred about 11 o'clock a. m. on January 6, 1937. The highway north of the curve is straight for a considerable distance and its surface at the point of accident is made of blacktop and is 18 feet wide. On each side of the blacktop there are shoulders and then ditches. A drizzling rain was falling at the time and the highway was both wet and slippery. There is a 3 per cent incline in the highway traveling north from the point of the collision.

At the time of the collision, plaintiff alleged his truck had been brought to a stop on the east side of the road (his right), with the two right wheels on the shoulder; and that the accident occurred through the negligence of the driver of defendant's truck. The negligence alleged

is that he was driving at a very fast, excessive, and dangerous rate of speed down the hill, on his left or wrong side of the road; that at the time he was violating the provisions of Act No. 21 of 1932, in that he was hugging the extreme left side of the "S" curve in the road on which he was traveling; that the speed of defendant's truck was in excess of 50 miles per hour and was driven in such a careless and wanton manner as to be beyond the control of the driver.

The owner of the truck and its insurer, the carrier of the public liability and property damage insurance on the truck, were made defendants. They deny any negligence on the part of the truck driver and alleged that plaintiff's negligence was the cause of the accident, in the following language:

"Further answering plaintiff's petition, your respondents show that the accident giving rise to this suit occurred at a point just north of the curve which plaintiff was attempting to traverse when his car skidded and got out of control; that, as a matter of fact, respondents' truck had not yet entered the curve when the accident took place, but was on a straight stretch of road, on its right, or proper side, of the highway; and that the accident was in no manner due to any negligence on the part of respondent's truck driver, but was caused solely by the negligent acts of the plaintiff, Herman Dozart, as hereinabove and hereinafter set forth. In the alternative, and in the event the court should find respondent's truck driver guilty of any negligence proximately causing said accident, which is denied, and in the alternative only, respondents show that the acts of plaintiff, Herman Dozart, in attempting to round the curve at an excessive rate of speed, resulting in his skidding sidewise into the path of respondent's truck on plaintiff's left side of the road, constituted contributory negligence proximately causing said accident, which is specially pleaded in bar of this suit."

The lower court found for plaintiff and awarded him judgment in the sum of $2,500. From this judgment defendants prosecute this appeal, and plaintiff has answered the appeal, praying that the amount of the award be increased.

The only question to determine in the case is, Which of the two vehicles was on its left or wrong side of the road at the time of the collision? It is purely and simply a question of fact. If plaintiff's truck was where he and his witnesses testify it was, and defendant's truck was at the place the defense witnesses locate it at the time of the accident, it would have been impossible for the accident to occur; in fact, there would have been sufficient room between them for the two cars to pass abreast. Some one necessarily must be mistaken as to the location of the two vehicles on the road at the time. There is no conflict in the testimony as to the position of the two trucks after the accident. Plaintiff's truck was in the ditch on the east side of the highway, the back end of which was facing in a northeasterly direction and the front end in a southwesterly direction. It is to be remembered that it was headed north at the time of the collision or just before. The front of defendant's truck was 25 to 30 feet south of plaintiff's truck, the front end of which was in the ditch on the west side of the road, and the back of the body and trailer extending diagonally across the road. The back end of the trailer extended to the east of the center of the pavement. The front wheels of defendant's truck were buried in the mud. The collision occurred on the highway just opposite or west of the point at which plaintiff's truck was knocked into the ditch.

There are five witnesses who testified as eyewitnesses. Plaintiff testified that he saw defendant's truck coming down the highway, zigzagging across the road; that he realized the danger and pulled his car to his right, placed the two right wheels on the right shoulder and brought it to a stop. He could not go any farther to his right without going into the ditch on the side of the road; that, when he stopped, he sounded his horn to attract the truck driver's attention; and that the front end of defendant's truck collided with his truck at about the left door. Plaintiff was rendered unconscious and knew nothing for three days. He was traveling 20 miles per hour when he first saw the truck owned by defendant.

Mrs. Dozart, plaintiff's wife, who was in the car with him, testified they were traveling about 20 miles per hour when she first saw defendant's truck coming toward them, zigzagging all over the road; that it was about 100 to 150 yards from them at the time. Her husband pulled his truck to the right until its two right wheels were on the shoulder and brought it to a stop; and that he sounded his horn

in an effort to attract the attention of defendant's truck driver. Mrs. Dozart was also knocked unconscious in the collision and did not remember anything until the next morning.

A Mr. La Prairie claims to have been an eyewitness. He testified he was traveling south on this highway and, when about a distance of 2 blocks north of the site of the accident, stopped his car and plainly saw the occurrence. He said the truck owned by defendant was traveling fast; that it passed him about five blocks north of the scene of the accident and at that time he was traveling from 35 to 40 miles per hour; that as it descended the hill just before the collision it was making the same speed and was zigzagging over the road; that plaintiff pulled his Ford truck to the right of the highway; that plaintiff was never on his left side of the road; and that the rear of plaintiff's truck was extending out into the highway farther than the front was. In other words, the front right wheels of plaintiff's truck were farther east of the blacktop part of the road than the right back wheel was. His testimony thoroughly corroborates that given by plaintiff and his wife. It is not shown that this last witness has any interest in the case. There was no attempt to impeach him by showing he was not present, or otherwise.

The only testimony tending to contradict Mr. LaPrairie's presence is given by Mr. Loftin, who was in charge of defendant's truck. He testified that he did not pass any truck within 2 miles' distance north of the locus of the accident. Mr. La Prairie testified that, although he was 2 blocks away from the scene of the accident, he did not go to the rescue of the injured persons and did not go there until they had been removed, which was about fifteen minutes after the accident had occurred.

■ It is for this reason that counsel for defendants ask us to disregard his testimony. It is strange indeed that he did not go to the assistance of those injured in the accident and we admit is entirely contrary to what the average person would have done. However, stranger things have happened, and we doubt if that fact alone is sufficient for us to say this witness was not present and that he had manufactured the testimony he gave under oath. His testimony is in line with the findings of the lower court, and undoubtedly was not rejected by it. His testimony as to the accident is clear and to the point and, since

he has not been shown to have any interest in the case or that he was even a close friend of plaintiff or that he had any reason to swear falsely, we are constrained to accept his testimony and give it at least the same weight as those who are interested in the outcome of the case, and we think all the other eyewitnesses are interested.

The other eyewitnesses who testified are the driver of defendant's truck and his foreman, or boss, who had charge of the truck and who was riding with the driver. We will discuss their testimony later.

J. A. Sartori, a mechanic, picked up plaintiff's truck and pulled it into Alexandria about an hour or more after the accident. He described the location of the two vehicles at that time as we have already found them to be. He testified that the shoulder of the road on the east side where plaintiff testified he had stopped his truck was torn up by the impact of defendant's truck against plaintiff's. Mr. Sartori further testified that defendant's truck would have had to come from its left side of the road to its right in order to get into the ditch in the manner it was; that it was impossible for the truck driver to have gotten the truck in the position it was after the accident, if he had been driving on his right side of the road. He further testified there were iron, glass, wood, and such débris right where the accident occurred, and that was where plaintiff's truck was, partly on the right shoulder. The bed of plaintiff's truck was there and the springs were on the concrete. He described the collision, from his observation of plaintiff's truck, as a "broadside swipe" hit at an angle.

Mr. Swinney, a contractor and civil engineer by profession, entirely disinterested, testified for defendant. He appeared on the scene about fifteen minutes after the accident. He testified that the tracks of defendant's truck showed that its right wheels had run on its right shoulder for a distance of possibly 40 or 50 feet before it went into the ditch.

The next witness used by defendant was the negro driver of the truck, who testified he was traveling from 28 to 30 miles per hour on his right side of the road; that he saw plaintiff's truck when it was more than 100 feet from him; that it was traveling about 40 miles per hour in the middle of the road. He described the collision as follows: "A. Well, just before we got to where the accident happened, there is a little hill and a steep curve, and just as we

entered over the hill, we seen a car coming out of the bottom from the other hill on the other side, coming to through the curve, and we were driving along, and he seemed to be in a rapid speed and he was driving down the center of the road, and just before he met us he must have put on his brakes to get back to his side of the road, and he commenced to skid and as he commenced to skid, we hit him."

Later on in his testimony, he said when plaintiff's car skidded in front of his truck the last time it was 20 feet or farther from him; that he applied his brakes and could have stopped his truck in 3 feet; but that plaintiff's truck skidded into his. Nowhere in his testimony does he say he ever changed his truck's course. He contends he was on his right side of the highway and that he maintained that position until after the collision. He does not claim he pulled the truck over onto the right shoulder, although Mr. Swinney had just testified that he saw tracks on that shoulder, which he thought were those of defendant's truck.

The next witness was Tom Loftin, the white man who was on defendant's truck and who had charge of it. He testified as follows:

"Q. Did you see this Ford pick-up truck coming before the accident happened, Mr. Loftin? A. Just a little short distance, as he came out of the curve.

"Q. Suppose you describe to the Court exactly what you saw there, and everything that happened? A. Well, we were coming down the hill, and just before we got to the curve about the distance from here to that door, I guess, this Ford came out of the curve,—there are some trees growing there—and as he came around that curve, he was more up in the center of the road and the road was wet, kind of drizzling rain, and as he looked up and saw the truck, he applied his brakes. The car he was traveling in was a little small or half-ton truck, I believe, and it turned that away.

"Q. Now wait, don't say that away, state what it did? A. It looked like it was going to turn sideways in the road, and he came on about the distance from me to you when he turned sideways again right across the road and my truck hit the rear end of it and knocked it back around on the other side.

"Q. Where was your truck at that time with reference to the left or right side of the road? A. The truck was on the right side of the road going to Alexandria.

"Q. What was the position of the Dozart truck at the exact moment of the collision, how was it on the road? A. Exactly crossways.

"Q. Crossways? A. Yes, sir.

"Q. What part of your truck hit that little Ford truck? A. The part of my truck?

"Q. Yes. A. The left front fender and headlight.

"Q. There was no part of the trailer or anything of that kind that hit the little truck? A. No, sir.

"Q. Just the front of your truck? A. Yes, that is all.

"Q. What happened to the Ford Pickup truck then? A. It knocked it around, turned the back end around up the highway.

"Q. And it went off the east side of the highway? A. Yes, on the right side going toward Monroe.

"Q. Where did your truck go? A. My truck went into the ditch on the right hand side going toward Alexandria."

He further testified that defendant's truck was traveling about 28 miles per hour and was on its right side of the road; that he did not see plaintiff's truck until "just a little bit before he hit us." Mr. Loftin further testified that his truck hit the plaintiff's squarely or broadside. He does not testify that his truck was pulled to the right onto the shoulder before the collision. His testimony is that it happened so quick there was no time to do anything. He did not consider it necessary to pull to the right or to slow down until a moment before the collision occurred, and then it was too late. On cross-examination, he was asked about driving on the shoulder of the road to prevent the collision, and still he did not claim his truck was over on the shoulder. He testified further as follows:

"Q. About what distance, Mr. Loftin, just approximately, was Mr. Dozart when you first saw him, from you? A. I couldn't say just how far it was.

"Q. Was there room for you all to pass on the right side, if you had driven on the shoulder of the road? A. How is that?

"Q. Was there room for the truck you were riding in to pass on the right hand

side, if you had driven on the shoulder of the road? A. You mean after his car turned crossways there, was there room for me to go around them?

"Q. Well then, his car was straddle of the road, but on the left hand side of the road? A. On my side of the road turned cross-ways.

"Q. Was it more on the left or on the right than it was in the middle of the road? A. The body of his truck was absolutely almost practically—the back end of it— in front of me, and I couldn't have missed that man and nobody else could, unless I went out in the woods. It happened so quickly, he just turned across the road."

J. E. Dean testified he came upon the scene about an hour or more after the accident had occurred, and that he noticed the truck tracks about 3 inches off the blacktop on the west side, starting at the place where he judged the driver had applied his brakes. He also testified that he could see skid marks made by plaintiff's truck on its left side of the road just prior to the time of the collision. He said he was a friend of Loftin, who had charge of the truck; that he did a great deal of work for the defendant company and was also a customer of defendant. He was the only witness who could find any skid marks, although others were specially asked about them.

A. J. Alexander, who visited the scene soon after Dean did, stated there were no skid marks on the blacktop. He was placed upon the stand by defendant.

Max Tully was also placed on the witness stand by defendant. He visited the scene of the accident about the time Dean and Alexander did. He testified there was nothing on the road to indicate where the accident happened and that one could not follow the tracks of defendant's truck from where it was in the ditch back north.

Mr. Lipscomb, defendant's mechanic, who repaired its truck, went after it and arrived soon after the noon hour. He testified that at that time he could not tell by any physical facts, tracks, skid marks, etc., where the collision took place. He described the damage to defendant's truck as follows: "Well, it was hit on the left side, on the front end and the trailer also broken loose and pulled forward, and it bent the back of the cab." He further testified it was not damaged at all on its right front. The left front light was broken and the left front fender was mashed in on the wheel.

We have reviewed all the testimony relating to where and how the collision occurred. We have no reason to doubt that Mr. Swinney saw truck tracks on the west shoulder of the highway just north of where defendant's truck went into the ditch, but we do have reason to doubt that they were made by defendant's truck, for the reason that neither occupant of the truck even claimed that it was traveling or driven on the shoulder, and Loftin makes it clear that there was no necessity for driving the truck onto the shoulder until a moment before the collision, and then it was too late.

Plaintiff's truck was hit on its left side about midway of the left door. From this point back to the rear of the body, the left side was demolished. The wooden part of the bed was broken, and fender, running board, and left rear wheel were also destroyed. The force applied to plaintiff's truck was apparently greater the nearer it came to the rear end of it. The fact that only the left front light and left front fender of defendant's truck were badly damaged, the back of the body bent, and the trailer broken loose, taken in connection with the damage done to plaintiff's truck, convinces us that defendant's truck struck plaintiff's at an angle and did not hit it broadside, as claimed by defendant. Furthermore, it is easy to reconcile the position of plaintiff's truck after the accident when we consider it was struck at an angle or sideswiped, with the greatest force being applied to its rear. To our mind, it is impossible to reconcile its position after the collision with a broadside impact occurring on the west side of the road. It is also apparent from all the testimony that plaintiff's truck went into the ditch at the very place where plaintiff claims he had stopped it before the collision. It is impossible for us to visualize a truck which is squarely across the left or west side of the highway, receiving a blow which will cause it to reverse ends and land in a ditch on the east side of the road and neither vehicle moved any distance north or south. We do not think it can be done. There is no difficulty in accounting for defendant's truck, after striking plaintiff's on the east side of the road, going into the ditch on the west side, some 30 feet south of the point of impact and in the direction in which the truck was headed.

We are convinced that the damage shown to have been done to the two cars is physical evidence corroborating plaintiff's theory of the accident. The lower court, on the evidence which we have reviewed and the physical facts we have enumerated, found that the collision was caused by the negligence of the defendants, and we are unable to say there is any error in its findings. It is one of those cases in which the finding of fact by the lower court must be given great weight, due to the conflicting testimony.

■ The remaining question is the quantum of damage plaintiff is entitled to recover. He was knocked unconscious at the time and remained so or in a semiconscious state for three days. He was confined in the hospital eight days and disabled for work sixty days. Plaintiff received a long, crescent-shaped laceration just below the left eye, and the left eyelid was severed entirely in the midportion. He received a fracture of both sides of the lower jaw, just opposite the mastoid bone. He had a disalignment of the thumb. Plaintiff was under the doctor's treatment for three months, and at the time of trial, May 24, 1937, had recovered from the laceration, but a noticeable scar was left on the lid. In the union of the fractured jaw, there was some disalignment, and he was unable to close his teeth in the proper manner. The articular surfaces of his teeth were not in perfect apposition, the upper with the lower. The lower teeth do not coaptate properly with the uppers, and therefore there is some difficulty in chewing, especially hard substances. It has also caused a slight disfigurement by the pushing backward of the lower jaw. He had an overbite before the injury—that is, the upper teeth protruded over the lower, all of which the injury has exaggerated. This condition is permanent, and plaintiff cannot open his mouth as well as he could before the accident. He suffered, of course, and was and is inconvenienced, due to his inability to eat as he could before the injury.

The testimony shows that plaintiff's truck was damaged to the amount of $200; his medical bill for himself and wife, who was injured in the same accident, was $200; their joint hospital bill was $118.15—making a total of $518.15. We are of the opinion he is entitled to recover this amount, above the $2,500 allowed by the lower court; and that the $2,500 for pain, suffering, disfigurement, and permanent injury to his jaw is not excessive.

It therefore follows that the judgment of the lower court is amended by increasing the amount of the judgment from $2,500 to $3,018.15; and, as amended, it is affirmed, with costs.

TALIAFERRO, J., dissents, giving written reasons.

TALIAFERRO, Judge (dissenting).

I have carefully studied the record in this case and reluctantly dissent from the finding of fact of the majority on the paramount questions of negligence and preponderance of proof. I am not convinced that the accident happened in the manner testified to by plaintiff. The burden was on him to establish his case by a clear preponderance of the testimony. I am more nearly convinced that the collision occurred in the manner contended for by defendant. Surely that contention of the two is the more strongly supported by the laws of physics and the common experience of persons who operate, or observe the operation of, motor vehicles in and upon curves and tangents on blacktopped highways made slippery by rainfall. The majority opinion does not fully describe the physical conditions about the road immediately south of the point of impact, nor the curve out of which the light truck of plaintiff was about to emerge when the collision occurred. South of the point of impact the highway describes a nine-degree curve to the left (east) which is considered by engineers to be sharp. Along the concave (east) side of the segment there is a growth of pine trees and underbrush of sufficient density to materially interfere with clear vision northerly by a motorist while on the lower (south) side thereof. The Strauss truck had not entered the curve at all. It was approaching the spot where the accident occurred on a tangent of several hundred feet. Its operators could not well see beyond the obstruction to view in the curve's concave side. Plaintiff's vision was obscured measurably by the same obstruction as he rounded the curve towards the south end of the tangent. He was then, in my opinion, on the convex side of the curve. The most natural thing for him to have done when he suddenly observed the truck coming towards him a short distance ahead was to try to get on his side of the highway by endeavoring suddenly to reduce his

truck's momentum. In the effort to do this he made the error of applying the brakes. All persons of experience know too well the effect forceful application of brakes will have on a rapidly moving light motor vehicle on a slippery road surface. The vehicle under such conditions will act exactly as Loftin says plaintiff's truck did immediately before the collision. On the other hand, it would be most unusual and unnatural for a heavy truck, with trailer, equipped with dual wheels, traveling on a perfectly straight highway, to act as plaintiff says defendant's did for some seconds prior to the collision.

The physical injuries to the Dozart truck, in their main features, strongly support Loftin's testimony when he said that the light truck skidded almost crosswise the road and was rammed by his big truck when in this position. The left rear fender of the light truck was ripped from its connection with the running board and crumpled against the truck's body. The end of the running board was tilted slightly upwards. It sustained no other injury. Had the damage been done by a sideswipe, the running board's injury would have been of a different character and much more serious, and the fender would have been sheared away instead of being rammed against the body. Again, the metal covering on the rear side of the cab was mashed in toward the front. Such an injury was impossible from a direct contact from the approaching truck. My theory of this particular injury is that it was caused by the violent swinging of the light truck against the wall enclosing the bed of the Strauss truck when the front end of the latter struck the former violently over its left rear wheel. The handle of the door of the light truck was uninjured. A sideswipe would most likely have sheared it from the door.

As regards the tracks of the Strauss truck on its right shoulder of the road about the point of the accident, we quote the testimony of Mr. H. E. Swinney, a civil engineer, then engaged in highway construction in Louisiana, to wit:

"A. The north side, in other words the truck coming this way had not entered the curve, the Strauss truck rather, and apparently the pick-up truck had gone around the curve and the Strauss truck was off the road with the front wheels buried in the ditch. It appeared that they were on the right side of the road coming this way and they got off the road to avoid an accident, and the front wheels were buried in the ditch on the right side, and the trailer part was still back on the road. It looked like they had gone on this shoulder for perhaps 40 or 50 feet in getting in this ditch. * * *

"Q. Did you observe any skidding marks on the highway in either direction? A. You could see the track where the big truck came from Monroe, and they got off on the shoulder, apparently as far as they could get, and then they went in the ditch."

This testimony, given by a highly intelligent college graduate, who has no interest of any character in the outcome of this suit, speaks for itself.

I do not think the position of the light truck after the collision specially significant. The physical movements of such a vehicle, when struck violently by another many times its weight, moving rapidly, cannot always be accounted for.

Had the Strauss truck sideswiped the other one, going 50 miles per hour downgrade, the former would not have stopped where it did, not much over its length and that of the trailer, from the point of impact.

The testimony of the witness La Prairie should be rejected. It is so unreasonable and his actions at time of accident, according to his own statement, so unnatural for a normal person, that we think it of no probative worth. He would have the court believe that he stopped his truck two blocks from the accident to look for scrap iron in the open pine woods; that he saw the collision and the following commotion; saw two injured and unconscious persons taken from the truck, and yet he complacently stood aloof, unwilling to yield to the impulses that must have urged him, if normal, to rush to the aid of the distressed. After the injured were driven away, he summoned courage enough to go to and view the scene. He gave this rather interesting testimony in explanation of his conduct, viz:

"Q. Mr. LaPrairie, couldn't you tell the people were hurt down in that accident? A. Well, I didn't want to run myself on down into it.

"Q. You were afraid you might get involved in it or something? A. Well, you can't ever tell.

"Q. And how long did you stand there and wait? A. I waited until they picked the people up and left."

When the conclusion is reached that La Prairie did not see the accident, plaintiff's case automatically topples. The need of the corroboration which his testimony is designed to supply is obvious. See Serpas v. Collard Motors, La.App., 178 So. 261, 264.

In reducing to writing the reasons for our dissent herein, we are not unmindful of the well-established rule that a trial judge's decision of factual questions should carry much weight and should not be over-ruled except when manifestly incorrect. The rule is a sound one. However, it is of common knowledge to bench and bar that reversal of trial courts on questions of fact are of rather frequent occurrence.